# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:12-cv-318-MR-DLH

| | | |
|---|---|---|
| DAVID WATKINS and<br>MAUREEN WATKINS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM ORDER** |
| | ) | **AND OPINION** |
| | ) | |
| SOPREMA, INC. and<br>ELASTIKOTE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

 **THIS MATTER** is before the Court on the Defendant Soprema's

Motion for Summary Judgment, as supplemented, [Docs. 53, 85], and said

Defendant's Motion to Strike [Doc. 71]. The dispute in this case surrounds

the ineffective repair of leaking roofs on three warehouses owned by

Plaintiffs David and Maureen Watkins. Plaintiffs bring this action against

Defendant Soprema, Inc. (Soprema), a distributor of a product used in the

repair. For the reasons that follow, the Court will grant the motion.[1]

---

[1] Plaintiffs also brought this action against Elastikote, Inc., the manufacturer of the
product in question. After the Court heard both Soprema's and Elastikote's motions for
summary judgment, the Plaintiffs moved to dismiss Defendant Elastikote. [Doc. 90].
That motion has been granted, [Doc. 91], making Elastikote's motion for summary

## FACTUAL BACKGROUND

In analyzing the Motion for Summary Judgment, the Court must view the forecasts of evidence in the light most favorable to the Plaintiffs as the non-moving party. <u>Adams v. UNC Wilmington</u>, 640 F.3d 550, 556 (4th Cir. 2011). Doing so yields the following factual background.

The Watkins purchased three warehouse buildings, located in Brevard, North Carolina, approximately fifteen to eighteen years ago. [Doc. 53-1 at 6]. All three warehouses were originally constructed with a built-up roofing system. [<u>Id.</u> at 7]. When the Watkins bought the buildings in the 1990s, a ballasted single-ply PVC membrane roof had been installed on top of the built-up roof. [<u>Id.</u>]. Plaintiffs began to experience leaks in the roofs in 2006 when this single-ply membrane split. [<u>Id.</u> at 7-8]. Watkins[2] decided to repair the roofs in 2006 using polyurethane foam. [<u>Id.</u> at 10]. Watkins believed this material would provide a durable, watertight treatment for his roofs. [<u>Id.</u>].

After obtaining bids, Plaintiffs contracted with Stephen Hollingsworth to undertake the repair. [<u>Id.</u> at 11]. Hollingsworth used a Spray Polyurethane Foam ("SPUF") product on the roofs. [Doc. 53-2 at 6].

judgment moot.

[2]All references in this Opinion that use the single surname "Watkins" shall mean David Watkins. References to Maureen Watkins will include her first and last names.

Hollingsworth gave Plaintiffs a warranty that he would replace or repair the roofs as necessary to guarantee a watertight roof for up to 10 years. [Doc. 53-1 at 9]. This warranty was a personal guarantee individually executed by Hollingsworth.[3] [Id.].

The roofs remained leak-free for approximately three years after the SPUF repair performed by Hollingsworth. When the leaks returned in 2009, Watkins ascended the roof and saw that the SPUF covering building 2 was "delaminated and separated." [Id. at 13-14]. Watkins realized that there was water trapped between the layers because he experienced a "floating sensation" when walking on the surface of the roof. [Id.]. Watkins demanded that Hollingsworth, who now owned Superior Contractors, Inc. ("Superior"), fix the leaking roofs pursuant to his warranty. [Id. at 15].

Hollingsworth agreed to honor his warranty and make the repairs. He told Plaintiffs that he was then using a "liquid product" for coating roofs in which he had "a lot of confidence." [Id.]. The product he recommended was Elastikote 1000 manufactured by Defendant Elastikote. [Id. at 17]. Hollingsworth's warranty work was to be at no charge to Watkins. [Id. at 26]. Hollingsworth, however, did not have the funds necessary to procure

_____

[3] The guarantee was also executed by Hollingsworth's then partner, Rick Daughtery. Daughtery is not otherwise involved in this matter. [Doc. 53-1 at 9].

the material, so Plaintiffs agreed to advance[4] Hollingsworth the $108,000 to purchase the Elastikote 1000 product. [Id.]. Hollingsworth recommended Watkins contact John Frye, a salesman employed by Elastikote. [Id. at 17]. Frye had previously been employed by Soprema, but that employment ended months earlier. [Doc. 53-3 at 2]. Soprema was a distributor of the Elastikote 1000 product. [Id.].

Watkins contacted Frye, who told Watkins that Elastikote 1000, an acrylic coating membrane, would be a good product to use for his roofs. [Doc. 53-1 at 16; 18]. Frye explained to Watkins that Elastikote 1000 would stick to various materials and would provide a "dry, watertight seal" for a flat roof. [Id. at 18]. Frye told Watkins that he (Frye) would contact Soprema and ask that Soprema send a representative to meet with Watkins. [Id.].

On October 26, 2009, Erik Karabin, the North and South Carolina district sales manager for Soprema, came to Watkins' office to meet with him. [Id. at 18-19]. Karabin told Watkins that the Elastikote 1000 product was an appropriate material for a "flat, built-up" roof. [Id. at 48]. Watkins spent 15 to 20 minutes speaking with Karabin, during which time Karabin gave Watkins some product literature. [Id. at 18]. This was the only contact

---

[4]Hollingsworth never repaid Watkins the $108,000. [Doc. 53-1 at 26].

Plaintiffs ever had with a representative of Soprema other than its accounting department regarding payment issues on Hollingsworth's account.  [Id. at 45].

On November 10, 2009, Watkins executed a contract with Superior for the repair of the roofs of buildings 1, 2, and 3.  [Id. at 20-21]. It is not explained in the record why Plaintiffs entered into this new contract with Superior (i.e. Hollingsworth's company) when Hollingsworth had agreed to repair the roofs pursuant to his own prior guaranty.  Pursuant to the contract, however, Hollingsworth agreed to do more than simply repair the roofs.  Instead he agreed to remove all the SPUF foam he had previously installed on each roof and to coat the roofs with Elastikote 1000. [Id. at 22; 24].

Prior to the application of the Elastikote 1000 product, Frye went to Plaintiffs' warehouse in Brevard one time, either "late November, [or] early December of '09." [Id. at 25; 31]. According to Watkins, Frye said that properly applied SPUF foam could remain in place, but if Hollingsworth found water under the foam, that particular portion of the SPUF needed to be cut out, the surface dried out, filled again with fresh foam, and coated. [Id. at 30]. Frye never returned to the project. [Id. at 31].

Plaintiffs had no contract with Soprema. [Id. at 41-42]. Watkins never purchased anything from Soprema, but he did send some payments to Soprema on behalf of Hollingsworth when Hollingsworth directed him to do so. [Id.]. Hollingsworth wrote into his contract with Plaintiffs that Soprema would issue a ten-year material warranty only for the Elastikote 1000 product. [Id. at 22-23]. Further, Watkins knew this material warranty would not be issued by Soprema until the application of the Elastikote 1000 was complete and the roofs were dry and leak-proof. [Id. at 28]. Watkins understood that any warranty issued by Soprema would be a materials warranty and would cover only the Elastikote 1000 product. [Id. at 47]. He also understood that, this would *not* include a workmanship warranty covering leaks resulting from deficient workmanship. [Id.]. The roof repairs, however, were never finished and Hollingsworth never achieved making the roofs dry and leak-proof. [Id. at 28]. As a result, Soprema never issued a material warranty to Plaintiffs. [Id. at 29].

Prior to the application of the Elastikote 1000 product, Hollingsworth cut out and removed "one little tiny bit" of the SPUF on building 1 that appeared "squishy." [Id. at 24; 31]. He did not, however, replace the foam in this location. [Id. at 34]. Hollingsworth removed most of the SPUF on

building 2, [Id. at 33], but did not remove any SPUF from building 3. [Id. at 24].

In late 2012, the roof of building 3 began to leak again. [Id. at 37]. Watkins climbed up onto the roofs and observed splits in various locations on the roof surfaces of all three buildings. [Id. at 35]. Following his inspection of the roofs, Watkins called Frye (Elastikote's representative) to track down Hollingsworth about the roof problems. [Id. at 28; 39]. Watkins made no other attempts to notify Elastikote about the leak issues. [Id. at 39-40]. Watkins never undertook to contact Soprema. [Id.]. Watkins ultimately located Hollingsworth, but when Hollingsworth was unable to fix the leaks, Watkins engaged Jeff Martin, of TAC Roof Designs, in an effort to seek a solution. [Doc. 53-2 at 2; 7]. Martin in turn contacted Scott Hall, a roofing contractor with Team Roofing, to perform repairs of the Watkins' warehouse buildings roofs. [Doc. 53-4 at 2]. By the time Watkins hired Team Roofing to remove the rest of the SPUF foam and perform roofing repairs in 2012, several roof locations on each of the three buildings were "weeping." [Doc. 53-1 at 36-37].

No evidence has been presented showing any forensic, chemical, or substantive analysis of the Elastikote 1000 product or showing that it was defective in any respect. Martin was not asked to perform any tests on the

7

Elastikote 1000 coating product. [Doc. 53-2 at 14-5]. Watkins himself did not do any material testing on the Elastikote 1000 product. [Doc. 53-1 at 23]; [Doc. 53-2 at 18]. Hall visually evaluated the roofs, but did not perform any chemical analysis on the Elastikote 1000 product. [Doc. 53-1 at 46]; [Doc. 53-2 at 3].

Martin testified that he saw blistering and splitting of the roofs' surfaces, which he opined was evidence of water migrating within the roof layers. [Doc. 53-2 at 8-9]. Martin said that water normally enters a roofing system through penetrations and roof curves. [Id. at 9]. He saw prominent splits in the Elastikote 1000 coating and the SPUF foam. [Id. at 11]. He opined that the blistering and the splitting of the Elastikote 1000 coating occurred due to the improper installation of the SPUF in 2006 and the lack of bonding between the top layers of that foam. [Id. at 12]. Martin could physically separate the layers on portions of the foam. [Id. at 13]. Also, according to Martin, there were irregularities in the thickness of the SPUF foam. [Id. at 16]. In some places the foam was so thin that "it appeared to be much thinner than normal SPUF roofs that you see." [Id. at 16-17]. Martin stated that his walking on the roof was sufficient for him to feel separation between the layers at the locations of the blisters. [Id. at 13]. Martin stated that he concluded there was water trapped on top of the

original built-up roof, below the SPUF foam and within the layers of the SPUF foam. [Id. at 9]. Improper installation of Hollingsworth's 2006 SPUF roof allowed water to penetrate the foam and become trapped. [Id.]. He said the trapped water, in turn, fueled "vapor drive," a condition in which the water vapor confined in and below the SPUF layer expanded, causing the foam to rise and bubble. [Id. at 9-10]. The rising and bubbling foam in turn caused the top coating to blister and split, through which more water was able to enter the roof system, eventually destroying the Elastikote 1000 coating. [Id.].

According to Martin, while Elastikote 1000 provided a sufficient temporary solution for a roof leaking due to a saturated foam membrane, given Hollingsworth's 2006 flawed SPUF application, it was not a long-term solution. [Id. at 20-1; 24]. Martin conceded that no manufacturer would warrant a roof under such circumstances. [Id. at 20].

## PROCEDURAL HISTORY

Plaintiffs, David Watkins and Maureen Watkins, husband and wife, began this lawsuit in North Carolina state court with a Complaint filed in the Transylvania County Superior Court on September 5, 2012. [Doc. 1-1]. Plaintiffs' original Complaint alleged claims for (1) breach of express warranties, (2) breach of implied warranty of merchantability, (3) breach of

9

warranty of fitness for a particular purpose, (4) negligent manufacture of material (Elastikote only), (5) general negligence, and (6) fraud. [Id.]. Defendants removed this case to this Court on October 5, 2012. [Doc. 1]. Elastikote filed its Answer the day of removal. [Doc. 2]. Soprema filed a Motion to Dismiss Counts Five and Six of Plaintiffs' Complaint [Doc. 8] on October 24, 2012, and, later that day, filed its Answer [Doc. 11]. After the parties briefed Soprema's dismissal motion, the Magistrate Judge issued his Memorandum and Recommendations [Doc. 41] recommending the Court deny Soprema's motion to dismiss count five of Plaintiffs' Complaint and the Court grant Soprema's motion to dismiss count six of Plaintiffs' Complaint. [Id. at 11]. On April 19, 2013, the Court accepted both of the Magistrate Judge's recommendations in an order filed that day. [Doc. 46].

On August 13, 2013, Plaintiffs filed a Motion to Amend Complaint. [Doc. 50]. Three days later, Soprema filed its Motion for Summary Judgment. [Doc. 53]. On August 20, 2013, Elastikote filed its Motion for Summary Judgment. [Doc. 55]. The Magistrate Judge granted Plaintiffs' Motion to Amend Complaint on September 20, 2013 [Doc. 67], and Plaintiffs filed their Amended Complaint September 24, 2013. [Doc. 68]. Both Suprema and Elastikote filed Answers to Plaintiffs' Amended Complaint on October 8, 2013. [Docs. 72, 73]. Following the filing of

Plaintiffs' Amended Complaint, Elastikote and Soprema supplemented their summary judgment motions, [Docs. 80, 85], and moved to strike portions of an affidavit filed by Plaintiffs in response to the summary judgment motions. [Doc. 71].

On November 22, 2013, this matter came on for hearing before the Court.  At the beginning of this hearing, before the arguments of counsel began, Plaintiffs filed a Motion for Voluntary Dismissal of Second, Third and Fourth Claims, and Claim One as to Elastikote only.  [Doc. 89].  The Court granted Plaintiffs' dismissal motion from the bench.  What remained of Plaintiffs' Amended Complaint, then, were: Claim One, breach of express warranties alleged against Soprema only; Claim Five, negligence alleged against both Defendants; and new Claim Seven, unfair and deceptive trade practices alleged against both Defendants.

After the hearing, while this matter was under advisement, Plaintiffs moved to dismiss all claims against Elastikote, [Doc. 90], which motion was granted. [Doc. 91].  This leaves for disposition only Defendant Soprema's Motion for Summary Judgment as to Claims One (express warranty), Five (negligence) and Seven (unfair trade practices).

## STANDARD OF REVIEW

Defendant Soprema has filed a motion for summary judgment under Federal Rule of Civil Procedure 56 wherein it contends that there are no factual issues for trial and that judgment may be rendered as a matter of law based upon the record.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record.  Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).  If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists.  Id.  Finally, in

considering the Defendants' summary judgment motions, the Court must view the pleadings and materials presented in the light most favorable to the Plaintiffs and must draw all reasonable inferences in Plaintiffs' favor as well.  Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## DISCUSSION

**I.    Plaintiffs' Express Warranty Claim – Claim One**

Plaintiffs' express warranty claim stems from Watkins' one-time meeting with Soprema's district sales manager, Erik Karabin on October 26, 2009.  During this meeting, Karabin gave to Watkins some kind of literature regarding Elastikote 1000.  The Court uses the phrase "some kind of literature" purposefully because the documents submitted by Plaintiffs in regard to their express warranty claim are illegible for the most part. [Doc. 62-2 at 1-4].  Moreover, these documents show on their face to be printouts obtained from Soprema's website on November 14, 2011, some two years after Watkins met with Karabin.  During his deposition, Watkins testified that he possessed the original documents provided by Karabin.  [Doc. 53-1 at 20].  Plaintiffs, however, never filed those 2009 documents as a part of their forecast of evidence.  This alone supports granting Soprema's summary judgment motion on this claim.  Showing what sort of express

warranty Soprema might have provided to some other customer two years after this transaction is no evidence of what, if any, warranty Soprema may have provided to Plaintiffs. There is simply no evidence of any express warranty by Soprema to Plaintiffs. Out of an abundance of caution, however, the Court will also address Plaintiffs' alleged warranty arguments.

Taking the Soprema documents submitted by Plaintiffs in the light most favorable to the Plaintiffs, any "warranty" contained therein would have been a service warranty. In fact, Plaintiffs argued that Soprema's warranty was one akin to a services contract. In their brief, Plaintiffs assert Karabin gave Watkins documents "stressing the services offered by Soprema's field technical department to its authorized contractors." [Doc. 62 at 3]. In one semi-legible portion of the document Plaintiffs obtained from Soprema's website, it recites that, "[d]uring a project, a member of the Field [illegible] Team will provide [illegible] inspections [illegible] ensure that [illegible] SOPREMA standards." [62-2 at 1]. According to Plaintiffs' brief [Doc. 62 at 3], Soprema's purported warranty to Plaintiffs was a services warranty and not a product warranty, a distinction Watkins clearly understood.[5] Plaintiffs, however, argue a claim they have not pled. By

_____

[5]Watkins testified during his deposition that "[a] workmanship [warranty] is certainly how something is built or applied, and the material [warranty] is the integrity of the material for that application." [Doc. 53-1 at 47].

switching from a product warranty claim to a services warranty claim, Plaintiffs are changing horses in mid-stream in an effort to survive summary judgment.

Plaintiffs' Amended Complaint clearly alleged a breach of warranty with regard to the Elastikote 1000 product, not its application:

> 23. The Defendants, Soprema, Inc. and ElastiKote, LLC had provided warranties, both express and implied and made direct representations amounting to express warranties that the roofing **material** would be of the highest quality providing a watertight and durable roof to the buildings, Warehouses 1, 2, and 3.

> 24. The Defendants, Soprema, Inc. and ElastiKote, LLC breached their warranties by providing a **deficient, defective and inferior roofing coating** that failed and left the Plaintiffs with a defective, leaking roof.

[Doc. 68 at 7] (emphasis added).

Watkins knew any material warranty would not be issued by Soprema until the application of the Elastikote 1000 was complete and the roofs were dry and leak proof. [Doc. 53-1 at 28]. Watkins testified that he understood that any warranty by Soprema would cover only the Elastikote 1000 product, not its application. [Id. at 47]. The roof, however, was never finished and never reached the point of being leak-proof. [Id. at 28]. Watkins admitted that no material warranty was ever issued by Soprema. [Id. at 29]. Plaintiffs cannot now rely on subsequent documents indicating

15

that there may have been a services warranty.  Such a claim was never asserted in this action.

Plaintiffs pleaded a breach of express product warranty, but they admit that no such warranty was furnished by Soprema.  On this basis, Soprema is entitled to summary judgment on this claim.  Plaintiffs' attempt to switch to an express services warranty also must fail because they have presented no forecast of evidence that such a warranty was furnished by Soprema or that it was breached.   For these reasons, Defendant Soprema's Motion for Summary Judgment as to Plaintiffs' express warranty claim – Claim One – is granted.

## II.     Plaintiffs' Negligence Claim – Claim Five

The Plaintiffs' negligence claim fares no better than their warranty claim.   Their forecast of evidence simply does not support the claim asserted in their Amended Complaint.[6]   The Amended Complaint, in pertinent part, states:

14. Before beginning work, ***the authorized agent of the Defendants*** Soprema, Inc., and ElastiKote, LLC, ***John Frye***, made a personal visit to the roofs of Warehouses 1, 2, and 3 owned by the Plaintiffs with the contractor, Superior Contracting

_____

[6]Plaintiffs' Amended Complaint is verified by David Watkins.  [Doc. 68 at 20].  As such, the Court treats this verified pleading as an affidavit for purpose of summary judgment. Williams v. Griffin, 952 F.2d 820, 823 (1991) (a verified complaint is the equivalent of an affidavit for purposes of summary judgment when the allegations contained therein are based on personal knowledge).

and made specific recommendations and advice to the contractor as to how to complete the repair. The Plaintiff David Watkins and his employee Mac Morrow accompanied Mr. Frye and the contractor to the rooftop and personally heard and observed Mr. Frye direct and supervise the contractor as to how to remediate the existing defective roof.

15. The Defendants, Soprema, Inc., and ElastiKote, LLC by and through *their authorized agent, John Frye*, determined and instructed the contractor, Superior Contracting as to how to remediate the roofs of the three (3) warehouses so as to provide for the highest quality waterproofing and roofing systems which would protect the buildings of the Plaintiffs.

16. Specifically, the *authorized agent of the Defendants*, Soprema, Inc. and ElastiKote, LLC directed the contractor to use the ElastiKote 1000 coating to be applied over the existing roof in the areas on Buildings 1 and 3 where the existing roofing had not delaminated, and to remove the delaminated existing roofing materials before applying ElastiKote 1000 where appropriate.

17. The contractor followed the directions, advice and recommendations of the Defendants, Soprema, Inc. and ElastiKote, LLC by and through *their authorized agent, John Frye*.

18. *Mr. Frye* determined and advised and directed the contractor, Superior Contracting to strip off the existing roofing on Building No. 2 and then to coat Building No. 2 with the ElastiKote manufactured by ElastiKote, LLC.

[Doc. 68 at 5-6](emphasis added).

As repeatedly stated in the Amended Complaint, Plaintiffs' negligence claim is premised entirely on John Frye being an "authorized agent" of Defendant Soprema. Frye, however, was an employee of Elastikote – not

Soprema.  Plaintiffs' agency theory arises simply from an assumption made by Watkins upon meeting Frye.  When asked during his deposition, "Did you ever call anybody at Soprema to ask them to come look at your roof?" Watkins responded, "No, because Frye represented himself as the material guy for both Soprema and Elastikote.  He said he used to work for Soprema; he's now with Elastikote; he was the expert. He presented himself that way."  [Doc. 53-1 at 40].  Even taking this testimony in the light most favorable to the Plaintiffs and giving the Plaintiffs the benefit of all favorable inferences, Plaintiffs' evidence of agency is that Frye said something to Watkins indicating that he (Frye) was the agent for Soprema. Frye's statements alone, however, are insufficient to establish that he was an agent for Soprema.

An agency relationship may arise upon a finding of either actual or apparent authority.  Actual authority, as the name denotes, comes about when a principal actually holds out his agent as a person possessing authority derived from the principal.  Zimmerman v. Hogg & Allen, 286 N.C. 24, 31, 209 S.E.2d 795, 799 (1974).  Apparent authority results from a principal permitting the agent to represent the existence of his authority.  Id. Either tacitly or explicitly, the principal must agree to the agent's authority. Thus, any statements made solely by a purported agent, without the

18

express or implied knowledge and consent of the purported principal, are insufficient to prove an agency relationship. Orr v. Orgo, 12 N.C. App. 679, 680, 184 S.E.2d 369, 369 (1971).

In this case, Watkins may have *assumed* Frye was the agent for Soprema either from meeting Frye, as discussed above, or from what Hollingsworth may have told Watkins about Frye. Plaintiffs present no forecast of evidence, however, that Soprema ever held out Frye to Plaintiffs as its agent or knowingly authorized and ratified Frye acting in this capacity. Rather, Plaintiffs' forecast of evidence tends to show the contrary. On one occasion, Frye met Watkins, Hollingsworth, and Morrow on the roof of one of Watkins' buildings. Following that roof meeting, Frye told Watkins that he would contact Soprema and have a Soprema representative call on Watkins to discuss the Elastikote 1000 product. [Doc. 53-1 at 18]. A few days thereafter, Erik Karabin, Soprema's district sales manager, came to meet Watkins at his office in Brevard. [Id. at 18-19]. Had Frye been Soprema's agent as Plaintiffs allege, Frye himself would have been the one to provide Watkins with Soprema's information, including any brochures and data sheets. Frye's call to a Soprema representative to meet with Watkins is a clear indication that Frye himself had no authority on behalf of Soprema. Other than Watkins' assumption

that Frye was Soprema's agent, Plaintiffs failed to present anything showing: (1) that Frye was acting in any capacity as an agent of Soprema and, (2) that Soprema knew and authorized Frye to act as its agent. As such, Plaintiffs' forecast of evidence fails with regard to this essential element. Plaintiffs have presented nothing to show that Frye was anything other than *Elastikote's* employee. The negligence claim asserted by the Plaintiffs in Claim Five alleges only negligence on the part of Frye and seeks to impute that negligence to Soprema by *respondeat superior*. Since Plaintiffs' evidence of Frye's agency fails, Soprema is entitled to summary judgment on this claim.

Plaintiffs' forecast on their negligence claim is also insufficient to survive summary judgment because it fails to show that any acts or omissions of Frye were negligent. In the Amended Complaint, Plaintiffs assert that Frye gave Watkins and Hollingsworth two general instructions on the application of the Elastikote 1000. First, with regard to buildings 1 and 3, Frye said to spread the Elastikote 1000 over the SPUF on those buildings unless the SPUF had delaminated. In any location where the SPUF had delaminated, that roofing material had to be removed. [Doc. 68 at 5-6, ¶16]. Second, with regard to building 2, all of the SPUF roofing material had to be stripped off before applying the Elastikote 1000. [Doc.

68 at 6, ¶18]. While the allegations in the Amended Complaint provided an overview of Frye's alleged instructions, Watkins' testimony, during his deposition, indicated that he understood Frye's remediation advice to him and Hollingsworth to be much more precise:

Q. Who told you that [John Frye had been on the roof]?

A. John Frye, when I got up there, he said I've been here, doing an inspection of this roof. And Hollingsworth called me, and so Mac and I went up and met him. We talked for maybe 15 minutes.

Q. Did you observe him actually instructing Mr. Hollingsworth in any regard?

A. I did.

Q. And what exactly did he say to Mr. Hollingsworth on this one occasion?

A. Well, I've got to be careful about that, he said to Hollingsworth and me, and he basically was educating me on the procedure that Hollingsworth would follow to properly apply the Elastikote material. That's what I observed. So he was telling Mac and me how this worked, how the process worked.

Q. Did he say generally if there seems to be water trapped, cut out the foam and replace the foam?

A. He didn't say generally. He said very specifically. He said if there's evidence that there's any trapped water you need to cut that out down to the roof, the built-up roof, let it dry, and either back-fill with foam and coat over it, or if it's near the edge, you can cut to the edge where water will drain in that direction.

Q. Right. Well, with that instruction or with that description, did he go any further to identify the specific locations where that

was appropriate?

A. He told me he hadn't found any places in buildings 1 or 3 that had evidence of water trapped underneath.

Q. So it was a general instruction to Mr. Hollingsworth?

A. Right. General, if you were to find something. But at that time, after several hours of walking the roof, he hadn't found any places that needed that attention.

Q. So he didn't know at that time whether or not that procedure would be needed?

A. I imagine not, no. Well, I can say he thought it would be needed if a place was discovered, He had not found a place.

[Doc. 53-1 at 31-33].

Taking the allegations in the Amended Complaint, together with Watkins' testimony, the forecast of evidence in a light most favorable to Plaintiffs would be that Frye gave Watkins and Hollingsworth a critical instruction with regard to using Elastikote on Watkins' three buildings: In order for the Elastikote to perform properly when applied over SPUF, water trapped below any part of the SPUF roofing material had to be eliminated by removing the offending SPUF material, drying all wet areas below it, and then back-filling with new SPUF where appropriate before applying the Elastikote.

Plaintiffs offered no evidence that this instruction was followed. On the contrary, Plaintiffs' expert, Jeff Martin, testified in his deposition that he

concluded there was water trapped on top of the original built-up roof, both beneath and within the layers of the SPUF foam. [Doc. 53-2 at 9].  He said that the improper installation of the SPUF roof by Hollingsworth in 2006 had allowed water to penetrate the foam and become trapped, and that the trapped water, in turn, fueled "vapor drive," a condition in which the water vapor confined in and below the SPUF layer expanded, causing the foam to rise and bubble.  [Id. at 9-10].  The rising and bubbling foam in turn caused the top coating to blister and split, through which more water was able to enter the roof system, eventually destroying the Elastikote 1000 coating. [Id.].  In short, Plaintiffs' own evidence shows that the wet foam was *not* removed as they assert Frye had instructed.

Undeterred, the Plaintiffs responded to Soprema's Motion for Summary Judgment by advancing an entirely new theory of negligence. This is based on the affidavit of Hollingsworth who said in pertinent part:

> 6. He (Mr. Frye) and I discussed his opinion that the proper job was to remove everything including the built up roof down to the deck and to apply a new roof; but that removing the foam roof as called for in the contract and applying Elastikote 1000 would work for the ten (10) year warranty roof for Mr. Watkins. He then instructed me not to remove all of the foam roof; but, just to remove it over one area in Warehouse 1 where there was an obvious water problem where the foam roof had "delaminated", but to leave the foam roof on the rest of the roofs and to cover the entire roofs, foam roof included, with Elastikote 1000.  He approved and recommended the job as described in the contract Exhibit "A" with the exception of leaving the foam on

the roof rather than removing it (it provided additional insulation). In spite of his concluding and discussing with me that the proper repair would be to take the roof down to the deck, not just to the built up roof, and installing a new roof as the proper remedy; he agreed that covering the existing roofs with Elastikote 1000 as the new roofs would be a "very acceptable remedy". He never mentioned removing everything down to the deck and putting on a new roof as the proper remedy again to me, and I don't believe he ever mentioned it to Mr. Watkins.

7. He also instructed me not to remove all of the foam roof, except in one area where there was an obvious water problem of delamination; but to cover the entire roof, foam roof included, with Elastikote 1000.

[Doc. 71-2 at 2-3]. With this, Plaintiffs appear to be advancing the theory that Frye admitted that his application advice would be insufficient because he actually believed that the old roofing material needed to be stripped off before the Elastikote product was applied. [Doc 62 at 4-5]. This, however, begs the question. Even if Frye's advice was negligent, there is no forecast of evidence that such negligence was the cause of the failure of the product, as Frye's advice *was not followed*.[7] Plaintiffs' own expert testified that the roofing materials were not dried out prior to the application

_____

[7] This one paragraph of Hollingsworth's affidavit (drawn by Plaintiffs' counsel) highlights the divided and even contradictory nature of the Plaintiffs' claim. On the one hand Hollingsworth admits that he was already contractually obligated to Watkins to remove all the roofing materials down to the bare deck. On the other hand, he claims that he deviated from this obligation, presumably to follow Frye's instructions. Plaintiffs' expert, Martin, clearly states, however, that Frye's instructions were not followed. If, in fact Hollingsworth deviated from his contractual obligations based on Frye's instructions, it remains unexplained why Hollingsworth failed to *follow* these instructions.

of the Elastikote and that this failure brought about the "vapor drive' which caused the Elastikote to fail. [Doc. 53-2 at 9-10]. An action based on negligent advice cannot lie if the advice was not followed. In such a circumstance, no proximate or causal relationship can exist between the advice given and the resultant harm.

For this reason, as well as because the Plaintiffs have failed to show that Soprema is responsible for the actions of Frye, Defendant Soprema is entitled to summary judgment as to the negligence claim - Claim Five.

## III. Plaintiffs' Unfair Trade Practices Claim – Claim Seven

Finally, Plaintiffs assert, in their response to Soprema's summary judgment motion, that the Defendant's unfair and deceptive trade practice consisted of Frye intentionally misleading Watkins about the appropriate remedy for his leaking warehouse roofs:

> Here, in contrast, Plaintiffs evidence clearly shows that the Defendant, through Frye, knew that the fix he was recommending to Watkins; and supervising and directing Hollingsworth to make, was not the correct remedy, and that he had no intent to do the right fix. His intent was to persuade Watkins to let Hollingsworth coat the existing roof with Elastikote 1000. To repeat, he had no intent to supervise Hollingsworth to do the proper job of removing all of the failed roofs before applying any remedy.

[Doc. 87 at 11].

Plaintiffs again conflate the issue of Frye's remediation advice with

Hollingsworth's failure to follow Frye's remediation advice. Plaintiffs have not shown that any action of Frye is attributable to Soprema, and Plaintiffs' own roofing consultant, Martin, testified that Frye's instructions were not followed. [Doc. 53-2 at 9]. As such, even if Frye "knew that the fix he was recommending was wrong" it caused no harm to the Plaintiffs. As for the argument that Frye "had no intent to supervise Hollingsworth to do the proper job," there is no evidence of any kind that Frye (whether on behalf of Soprema or anyone else) undertook to supervise Plaintiffs' contractor Hollingsworth. For these reasons Soprema is entitled to summary judgment on this claim as well.

## CONCLUSION

Based on the foregoing, the Court concludes that Plaintiffs' claims for breach of express warranty, negligence, and unfair and deceptive trade practices fail as a matter of law, there being no genuine dispute as to any material fact underlying each claim.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant Soprema's Motion for Summary Judgment, as supplemented [Docs. 53, 85] is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that the Motion to Strike [Doc. 71] is

**DENIED** as moot.

**IT IS SO ORDERED.**

Signed: March 27, 2014

Martin Reidinger
United States District Judge